UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11897-GAO

WILLIAM RAGLAND,
Petitioner,

v.

PETER ST. AMAND, Superintendent,
Respondent.

OPINION AND ORDER
December 21, 2010

O'TOOLE, D.J.

The petitioner, William Ragland, seeks a writ of habeas corpus under 28 U.S.C. § 2254. In 2002, Ragland was convicted in the Massachusetts Superior Court of assault and battery and assault and battery by means of a dangerous weapon (a knife). Commonwealth v. Ragland, 894 N.E.2d 1147, 1150 (Mass. App. Ct. 2008). He was acquitted of assault with intent to murder and assault and battery by means of a dangerous weapon (a shod foot). Id. Ragland appealed to the Massachusetts Appeals Court, which affirmed the convictions on November 14, 2008. Id. at 1164. Ragland's attempt to have his conviction further reviewed by the Massachusetts Supreme Judicial Court ("SJC") was rejected by that court. Commonwealth v. Ragland, 898 N.E.2d 862 (Mass. 2008). His habeas petition was filed October 23, 2009.

## I. Background

The following summary of the facts of this case is taken from the Appeals Court opinion of November 14, 2008:

In the late hours of September 24 into the early morning of September 25, 2000, several hundred people attended a party at the Buzz Club in Boston. Ragland, 894 N.E.2d at 1151. At

approximately 1:00 a.m. on September 25, Paul Pierce and two friends, Derrick and Tony Battie, arrived at the party. Id. Shortly after arriving, Pierce engaged in a brief conversation with two women, Delmy Suarez and Keisha Lewis, while the defendant, William Ragland, Lewis's cousin, stood nearby. Id. A brief exchange of words occurred between Ragland and Pierce before a fight erupted. Id. Witnesses estimated that eight other individuals joined Ragland in what was characterized as a "vicious and sustained" attack on Pierce. Id. According to Pierce, assailants landed punches all over his body, one broke a bottle over his head, and he felt "stinging, piercing thrusts" to his abdomen and back, resulting in multiple deep stab wounds. Id.

Pierce's assailants subsequently fled the scene. Id. In the hours after the attack, the police received no information from anyone who was at the club that night that could lead to the identities of the men who attacked Pierce. Id. However, approximately thirty-two hours after the assault on Pierce, Detective Barnicle of the Boston police was contacted by a Rhode Island police officer who told Barnicle he interviewed a local college student, Krystal Bostick. Id. at 1152. Bostick claimed she witnessed the attack on Pierce at the Buzz Club, and that a man she knew as "Roscoe" or "Rocco" played a part in the assault. Id.

Detective Barnicle, along with another officer, Detective Chin, traveled to Providence on September 26, 2000 to meet with Bostick in person. Id. Bostick told the detectives that she saw Roscoe use a serrated-edge knife to stab Pierce in the chest. Id. Bostick was shown two photographic arrays compiled by the detectives using the information developed in the investigation up to that point. Id. Bostick identified the photograph of Ragland in one of the photo arrays, and told the detectives that he was the man she knew as Roscoe or Rocco. Id. Bostick circled the photograph of Ragland, and signed and dated next to it. Id.

Bostick appeared before the grand jury and gave highly incriminating testimony against Ragland. She told the grand jury that Ragland initiated the attack that night at the Buzz Club and that at one point during the melee he drew a knife with a serrated edge and stabbed Pierce repeatedly. Id. Bostick's testimony led to Ragland's indictment.

But Bostick proved a reluctant witness at trial, at first refusing to give any response to many of the prosecutor's questions, claiming she did not remember the events that occurred at the Buzz Club the night of the incident. Id. at 1152-53. Bostick at one point claimed that she did not even remember where she was on the night of September 24-25, 2000. Id. at 1153. The prosecutor continued to press Bostick, but she continued to provide less than forthright answers. Id. Bostick testified that she had been mistaken when she testified about the actions she saw Ragland take that night, and that she did not see him do many of the things she claimed, directly contradicting her prior statements to police and her grand jury testimony. Id. She did testify that she saw Ragland at the Buzz Club that night, and that Ragland approached Pierce during the party, but she claimed she did not pay close attention to what Ragland was doing, never saw him in possession of a knife, and did not see him move his arm in stabbing thrusts in the direction of Pierce. Id. She denied that the man she identified from the photo array, Ragland, held a knife and stabbed Pierce. Id.

Bostick claimed she changed her testimony between grand jury and trial because her original story was an exaggerated account of the night's events that she concocted when she realized how much media attention the case would receive. Id. The potential publicity was due to the fact that the victim, Paul Pierce, was a member of the Boston Celtics. Id. She claimed she did not understand the seriousness of testifying before a grand jury, which was why she felt

comfortable telling the grand jury the falsified account of what she witnessed the evening of the incident. Id.

As a result of Bostick's decision to recant her story, the prosecutor confronted her with her sworn grand jury testimony. Id. Because her prior inconsistent statements were given under oath during the grand jury proceedings, under Massachusetts evidence rules, the prosecutor was able to introduce her grand jury testimony not just for the purpose of impeaching her credibility, but also as substantive evidence. Id. at 1154. This allowed the prosecutor to read into evidence excerpts of Bostick's grand jury testimony, specifically those where she claimed Ragland pulled a knife during the brawl and repeatedly stabbed Pierce. Id.

A second witness, Regina Henderson, gave testimony at trial that contradicted in part the testimony she had previously given to the grand jury. Id. at 1159-60. Henderson had testified at the grand jury that, while she did not see Ragland with a knife on the night of the incident, she did see blood on his hands immediately after the attack on Pierce, which he attempted to wash off. Id. at 1159. She recanted part of her grand jury testimony at trial, saying only that she saw the defendant fighting with Pierce. Id. at 1160. In light of this recantation, the prosecutor was allowed to read into evidence Henderson's prior inconsistent statements made under oath before the grand jury, specifically her contention that she had seen blood on Ragland's hands. Id.

At closing argument, the prosecutor said the following regarding why Bostick and Henderson may have changed their stories from the grand jury to the trial:

> Getting back to [Bostick's trial] testimony . . . and that recanted version . . . . What's different between October third in the year 2000 to when she testified before you last week? What's different? Grand jury, private proceeding, under oath, just like she's under oath here. No one's there. Mr. Watson, Mr. Ragland . . . , no one's there. She makes the identification. She's gone down that path just like Regina Henderson was going to go down that path two days later. They can't take it back.

4

Id. at 1162. The defendants objected to this statement by the prosecutor, but the objection was overruled and the court took no curative action.

## II. Discussion

### A. Summary of Grounds Presented

Ragland asserts two grounds in support of the issuance of a writ of habeas corpus. First, he claims there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of assault and battery by means of a dangerous weapon, particularly in light of the trial testimony of Bostick and Henderson recanting prior inculpatory statements. He also contends that the prosecutor committed misconduct when he argued during his closing argument that the presence of the defendant at trial intimidated Bostick and Henderson, causing them to recant their grand jury testimony.

### B. Standard of Review

In order to obtain a writ of habeas corpus, a person in custody pursuant to the judgment of a state court must show one of two things: either that the adjudication of the claim on the merits in the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding," id. § 2254(d)(2).

A decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "[i]f the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."

Williams v. Taylor, 529 U.S. 262, 405-06 (2000). A state court unreasonably applies Supreme Court precedent when it identifies the correct operative legal rule in the case at hand but applies it in an unreasonable manner to the specific facts of a petitioner's case. Id. at 407. To find that Supreme Court precedent has been unreasonably applied, the application must be more than merely incorrect; it must be "objectively unreasonable." Id. at 410. Simple error is not enough to make out a claim for unreasonable application of Supreme Court precedent; the error must be so great that the decision of the state court appears clearly unreasonable "in the independent and objective judgment of the federal court." McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002).

In considering whether an adjudication was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C. § 2254(d)(2), a state court's findings of fact are presumptively correct, and the petitioner is charged with the burden of rebutting this presumption by clear and convincing evidence, id. § 2254(e)(1). Facts are defined as "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (quoting Bryson v. Ward, 187 F.3d 1193, 1211 (10th Cir. 1999)).

### C. Ground One: Insufficient Evidence of the Use of a Dangerous Weapon

Ragland alleges that there was insufficient evidence to prove him guilty beyond a reasonable doubt of assault and battery by means of a dangerous weapon because the only evidence of his use of a knife was the recanted and substantially impeached grand jury testimony of a single witness, Bostick. He specifically claims that the state court decision violated the precedent set in Jackson v. Virginia, 443 U.S. 307 (1979), because "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." See id. at 324.

Ragland contends that the only direct evidence that he used a knife was Bostick's grand jury testimony, which she recanted and contradicted at trial. He also points to the myriad different stories told by the witnesses who took the stand at trial, suggesting that the inconsistencies in witness testimony point to the impossibility of any one witness knowing the true and accurate story of what occurred that night.

Despite Ragland's contention, the portions of Bostick's grand jury testimony read into evidence were not the only evidence supporting a conclusion that he was guilty of assault and battery by means of a dangerous weapon. There was Detective Barnicle's testimony, given without defense objection and thus admitted for its full substantive force, describing statements Bostick had made during the interview conducted at the Providence police station, which corroborate her grand jury testimony that Ragland assaulted Pierce with a knife, as well as trial testimony concerning Bostick's out-of-court identification of Ragland during the Providence interview, where Bostick chose Ragland's photograph out of an array and, in the course of the identification, told the detectives, according to Detective Barnicle, that he was the man who "stabbed the frontal area of Paul Pierce" with a knife with a serrated edge. There was also the circumstantial evidence presented at trial that Henderson saw Ragland with blood on his hands just after the stabbing, and also saw him attempting to wash the blood off. Other than the issue of the knife, of course, there was plenty of evidence that Ragland had engaged in an attack on Pierce. Ragland, 894 N.E.2d at 1155-56, 1159.

The Appeals Court applied the Massachusetts rule articulated in Commonwealth v. Latimore, 393 N.E.2d 370 (Mass. 1979), adopting the federal sufficiency of evidence standard set by Jackson v. Virginia, 443 U.S. 307, for cases reviewed in Massachusetts state appellate

courts. By applying Latimore, the Appeals Court thus also addressed the federal constitutional question. See Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008).

Viewed in the light most favorable to the prosecution, enough evidence was presented in this case for a rational trier of fact to find Ragland guilty of assault and battery by means of a dangerous weapon. There was evidence that several witnesses saw Ragland leading the assault on Pierce, a witness saw Ragland pull a knife and use it to stab Pierce repeatedly during the brawl, and another witness saw blood on Ragland's hands and witnessed his attempts to wash it off. Ragland, 894 N.E.2d at 1155-56, 1159. There was evidence pointing away from Ragland's use of a knife, as well, but the question under Jackson is whether a rational trier of fact, accepting Bostick's grand jury statements as more reliable, could have found the elements of the offense, specifically including the use of a dangerous weapon, beyond a reasonable doubt. Applying the state standard that is substantially similar to the Jackson standard, the Appeals Court answered that question in the affirmative. In the particular circumstances of this case, that was a decision that was neither contrary to the Jackson principle nor an unreasonable application of it.

### D. Ground Two: Prosecutorial Misconduct

Ragland's second claim is that a statement by the prosecutor in closing argument implied, without any factual basis, that Bostick and Henderson changed their testimony between the grand jury and trial because of threats made by or on behalf of the defendants, including Ragland. Although defense counsel made a contemporaneous objection to the comments, the trial court took no corrective action, and the appellate court found no error. Ragland asserts that the standard of review as to this issue is prejudicial error, and that the prosecutor "ha[d] 'so poisoned

8

the well' that a new trial is required." See United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994).

The standard of review in this situation is not prejudicial error, as Ragland suggests. It is the same standard of review used for all habeas corpus petitions: whether the adjudication of the claim on the merits in the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding," id. § 2254(d)(2).

In his petition and his memorandum in support of it, Ragland does not state precisely which of his constitutional rights were violated, but the Appeals Court understood him to be asserting that the prosecutor's remarks denied him a fair trial in violation of rights guaranteed under the Fifth and Fourteenth Amendments. Ragland, 894 N.E.2d at 1163 n.18. The applicable Supreme Court precedent, Darden v. Wainwright, frames the relevant question as "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 U.S. 168, 181 (1986) (quoting 644). The remarks of the prosecutor must be more than merely "undesirable or even universally condemned." See id. (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983)).

The Appeals Court, assuming that the prosecutor's remarks were improper, concluded that they nevertheless did not render the trial fundamentally unfair. The court pointed to four factors supporting that conclusion: the ambiguity of the remarks, the jury's opportunity to observe and assess the witnesses' demeanor in testifying, the judge's repeated general cautions that counsel's statements were not evidence, and the jury's judgmental discrimination in finding

9

guilt on some charges but not others. Ragland, 894 N.E.2d at 1163. The court's decision in this respect was neither contrary to the Darden principle nor an unreasonable application of it to the facts of the case.

## III.     Conclusion

For the foregoing reasons, the petitioner has not met his burden of showing that the state courts' adjudication of any of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," see 28 U.S.C. § 2254(d)(1), or that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," see id. § 2254(d)(2). He is not entitled to a writ of habeas corpus, and his petition is therefore DENIED.

## IV.     Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." When a district court has rejected a petitioner's constitutional claims on the merits, for a certificate of appealability ("COA") to issue, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." See Slack v. McDaniel, 529 U.S. 473, 483 (2000). This Court must determine whether "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." See id. at 484 (internal quotation marks omitted). If the court answers these questions in the negative, a COA will not be granted. See id.

An issue "can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that the petitioner will not prevail." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003). However, the "issuance of a COA must not be pro forma or a matter of course" because Congress has "confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not." Id. at 337.

This Court has determined that the state court did not apply clearly established Supreme Court precedent in an "objectively unreasonable manner." See Williams, 529 U.S. at 413. No reasonable jurist could find this conclusion to be debatable. Therefore, a COA is not being granted. Ragland may not appeal this Court's decision refusing to grant him a COA, but he may seek a certificate from the Court of Appeals for the First Circuit pursuant to Rule 22(b)(1) of the Federal Rules of Appellate Procedure.

It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
United States District Judge